## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

COURTNEY STAMM,

      **Plaintiff,**

                                 **Civil Action 2:19-cv-4841**
                                 **Judge Edmund A. Sargus, Jr.**
    **v.**                         **Chief Magistrate Judge Elizabeth P. Deavers**

COMMISSIONER OF SOCIAL SECURITY,

      **Defendant.**

### REPORT AND RECOMMENDATION

Plaintiff, Courtney Stamm ("Plaintiff"), brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for supplemental security income benefits.  This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 11), the Commissioner's Memorandum in Opposition (ECF No. 17), Plaintiff's Reply to the Opposition (ECF No. 20), and the administrative record (ECF No. 8).  For the following reasons, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

### I.  BACKGROUND

Plaintiff applied for supplemental security income benefits on February 24, 2016, alleging disability beginning September 1, 2015.  (R. at 124-135.)  Plaintiff's claim was denied initially and upon reconsideration.  (R. at 66-92.)  Upon request, a hearing was held on February

1

1, 2018, in which Plaintiff, proceeding without the assistance of counsel,[1] appeared and testified. (R. at 34-65.)  A vocational expert ("VE"), John Finch, also appeared and testified at the hearing. (*Id*.)  On July 23, 2018, Administrative Law Judge Jason C. Earnhart ("the ALJ") issued a decision finding that Plaintiff was not disabled.  (R. at 13-33.)  On September 5, 2019, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision.  (R. at 1-6.)  Plaintiff then timely commenced the instant action. (ECF No. 1.)

## II.  RELEVANT HEARING TESTIMONY

### A.  Plaintiff's Testimony

Plaintiff testified at the February 2018 administrative hearing.  (R. at 39-60.)  Plaintiff testified that she was driven by her boyfriend approximately two hours to the hearing, and that driving that far was difficult for her, given her ADHD and restless leg.  (R. at 39-40, 47.) Plaintiff testified that she only drives "[e]very now and then," and that on the drive to the hearing they had to stop once or twice so that Plaintiff could move around.  (R. at 47.)  Plaintiff testified she has Madelung's Disease in her arm, and that she previously had a broken arm "on and off for two years" when she was in middle school.  (R. at 42.)  Plaintiff testified she took sodium pills to "harden up" her arm, and it helped somewhat but she has bad arthritis as a result and is often unable to use her arm to pick things up.  (R. at 42-43.)

Plaintiff testified that she previously had a job "for about a week or two" but she stopped because she could not "stand for a long period of time because it makes [her] back hurt."  (R. at

---

[1] At the outset of the administrative hearing, the ALJ advised Plaintiff that she had the right to be represented by an attorney or non-attorney, and that a representative might be able to help Plaintiff explain information about her claim, explain terms, help protect Plaintiff's rights, or make any requests before the ALJ.  (R. at 37.)  After being so advised, Plaintiff waived her right to counsel.  (R. at 37-38.)

44-45.)  Plaintiff testified her back "gets dislocated all the time."  (R. at 45.)  Plaintiff testified

that she has looked for every kind of job, and she has been trying to work on obtaining her GED

because she dropped out of high school in the eleventh grade.  (R. at 46, 59.)  Plaintiff testified

that when she was in school, she got bullied a lot and had an Individualized Education Program

(IEP) that put her in special education classes.  (R. at 59.)  Plaintiff testified that she can't focus

on anything when she is sitting down doing work due to her ADHD.  (R. at 46.)  Plaintiff

testified that she had looked for jobs at McDonalds and Wal-Mart, but they didn't hire her.  (R.

at 46, 58-59.)

Plaintiff testified that she had a newborn baby, almost two months old at the time of the

hearing, and that she and her baby lived in a camper adjacent to her parents.  (R. at 49.)  Plaintiff

testified that she previously had been married, but her husband left.  (*Id.*)  When asked to

describe her typical day, Plaintiff testified that she usually "stay[s] at the house as much as

possible because [she is] not much of a social person."  (R. at 50.)  Plaintiff testified that she

"do[esn't] like going out too much," but she attends a photography class twice a week in Athens,

Ohio, and she goes to a counseling group every other week in Piqua, Ohio.  (*Id.*)

When asked why she believes she cannot work, Plaintiff testified that her asthma bothers

her after about an hour of standing.  (R. at 51-52.)  Plaintiff also testified that some days she

wakes up with back pain, and that lately she had experienced restless leg syndrome if she stood

for more than an hour.  (R. at 52.)  Plaintiff testified that she had tubes placed in her ears in 1995,

and that has helped her ears but her doctors were considering additional treatment to relieve

pressure.  (R. at 56-57.)

Plaintiff testified that her boyfriend gets supplemental security income benefits, but

Plaintiff did not know why.  (R. at 53.)  Plaintiff testified that her boyfriend has ADHD, anxiety,

and depression "just like I do." (R. at 54.)  Plaintiff testified that because her boyfriend does not

work, he is able to help take care of her baby.  (R. at 53.)  Plaintiff testified that her mother also

stays home to help take care of the baby.  (R. at 57.)  Plaintiff testified that her mother attempted

to get supplemental security income benefits, but she was rejected because Plaintiff's father gets

disability benefits.  (R. at 58.)  Plaintiff testified that she, her mother, her father, and her

boyfriend are all home together all day.  (*Id.*)

**B.**     **Vocational Expert's Testimony**

Dr. John Finch testified as the VE at the administrative hearing.  (R. at 60-64.)  Based on

Plaintiff's age, education, and work experience and the residual functional capacity ultimately

determined by the ALJ, the VE testified that a similarly situated hypothetical individual could

perform the following jobs that exist in significant numbers in the national economy:  mail

sorter, garment folder, and machine feeder.  (R. at 63.)

### III.  RELEVANT RECORD EVIDENCE

**A.**     **School Records**

On March 28, 2007, Plaintiff was reevaluated by an assessment team at Vinton County

High School to determine whether she needed special education services.  (R. at 196-203.)  The

Evaluation Team Report from that assessment highlighted her "current disability" as "hearing

impaired," and concluded that Plaintiff's hearing loss "has had an adverse effect on [Plaintiff's]

educational performance and requires Special Education Services."  (*Id.*)  One evaluator noted

that "[i]t is very important that she receive special education services," but that "[Plaintiff] can

continue to succeed in regular education with modifications and supplementary support."  (R. at

200.)

Plaintiff withdrew from Vinton County High School in February 2008, during her Junior year.  (R. at 194.)

**B.      Hopewell Health Centers**

Plaintiff received counseling treatment at Hopewell Health Centers ("Hopewell") from February 26, 2015 through November 8, 2017.  (R. 346-417.)  Plaintiff appeared for approximately eighteen (18) counseling sessions over this period, generally attending one counseling session per month.  (*Id.*)  At her first appointment on February 26, 2015, Plaintiff reported nightmares, depressive symptoms, and PTSD symptoms related to the deaths of her uncle and cousins, and Plaintiff was diagnosed with PTSD; Major Depressive Disorder, Moderate; Madelung's Disease; and Asthma.  (R. at 413.)

Over the course of her treatment at Hopewell, Plaintiff was prescribed psychotropic medication and responded favorably.  By December 29, 2015, for example, Jodi Jones, LPCC-S, reported that Plaintiff "has made significant improvements in [reducing] depression and [PTSD] symptoms.  Medication helps to [reduce] ADHD symptoms & depression."  (R. at 396.) Plaintiff's treatment providers noted that she made progress over the course of the counseling. At Plaintiff's last appointment on November 8, 2017, Clarence Harris, LPC, wrote that Plaintiff "appears to be implementing coping strategies to reduce stress/anxiety and using supports to help manage stress.  Client reported work stress has surfaced but stated she has been able to handle with coping strategies and use of her support systems."  (R. at 372.)  The records from Hopewell suggest that Plaintiff stopped attending counseling after the birth of her child.

**C.      Gary S. Sarver, Ph.D.**

On January 8, 2016, Plaintiff was evaluated by Dr. Gary S. Sarver, at the request of the Division of Disability Determination, to determine her level of intellectual and psychological

functioning.  (R. at 322-330.)  During the examination, Plaintiff told Dr. Sarver she cannot work now because "of the disease of my arm," and she said she was referred "by my counselor because I don't get along with people."  (R. at 322.)

Dr. Sarver noted that Plaintiff's "independent living skills appear to be adequate," and he reported that Plaintiff participates in cooking, dishes, laundry, shopping, and bill paying.  (R. at 323.)  Dr. Sarver added that "[s]he appears to perform these tasks adequately," but he quoted Plaintiff as saying her husband helps her "because I get sidetracked easily."  (*Id.*)  Plaintiff reported being bullied a lot in school, and that she quit school in tenth grade because she was tired of being bullied.  (*Id.*)  Dr. Sarver noted that "[s]he seemed to get along reasonably well with her parents and teachers," but "[s]he does report a pattern of difficulty interacting with neighbors and others."  (R. at 323-324.)  Plaintiff told Dr. Sarver that she avoids others because "I don't get along."  (R. at 325.)

Dr. Sarver identified Plaintiff's current medical problems to include asthma and Madelung's disease.  (R. at 323.)  Plaintiff also reported attending outpatient psychotherapy for depression, first at age 15 (for two years) and then again over the past year.  (R. at 324.)  Plaintiff also reported having difficulty sleeping due to restless leg syndrome.  (*Id.*)  Dr. Sarver noted that Plaintiff reported subjective depression related to car accidents, having lost her cousin and uncle to a car accident in 2006.  (*Id.*)  Plaintiff told Dr. Sarver she worries about everything, and that she felt hopeless and helpless about her life.  (*Id.*)

Dr. Sarver reported Plaintiff's results on the WAIS-IV test, concluding that Plaintiff achieved a verbal comprehension score of 74 for a percentile of 4; a perceptual reasoning score of 67 for a percentile of 1; a working memory score of 74 for a percentile of 4; a processing speed score of 76 for a percentile of 5; and a full scale IQ of 67 for a percentile of 1.  Dr. Sarver

concluded that her test results "place[] her overall level of intellectual functioning within the borderline to mentally retarded range." (R. at 326-327.) Dr. Sarver diagnosed Plaintiff with an unspecified depressive disorder and a mild intellectual disability, concluding as follows:

> Her intellectual disability suggests that she is likely to have a difficult time dealing with complex situations and she tends to be concrete and present oriented in her thinking style. She is likely to have difficulty with the functional use of academic skills such as reading and money management. Socially she is likely to be seen as concrete and immature in terms of her interactions. She may have difficulty regulating her emotions in an age-appropriate fashion. She is likely to have difficulty understanding the complexities involved in social interactions. Occupationally, competitive employment is possible in jobs that do not emphasize conceptual skills. She is likely to deal better with concrete, observable, and repetitive job tasks. She is likely to have difficulty dealing with normative work stressors. She is likely to need some help and guidance in her activities of daily living. These functions are further exacerbated by her ongoing depression.

(R. at 327.) Dr. Sarver added that "[s]hould benefits be granted, it is unlikely that she could manage them in her own best interest due to her borderline level of intellectual functioning and poor math skills." (*Id.*)

Dr. Sarver also provided a functional assessment, concluding that Plaintiff "should be able to understand, remember, and carry out simple job instructions"; that she "is likely to perform better with situational structure and scaffolding"; and that she "is likely to encounter considerable difficulty when dealing with complex job instructions." (R. at 328.) Dr. Sarver also wrote that Plaintiff "is likely to encounter consistent difficulty when performing multistep tasks," and "[h]er limited level of intellectual functioning suggests that she is going to have difficulty understand the complexities of social interactions." (*Id.*) Dr. Sarver opined that "[s]he is likely to have difficulty consistently and productively interacting with supervisors and coworkers in a work setting," and noted that "[h]er limited level of intellectual functioning and concomitant poor coping skills makes it difficult for her to adaptively manage and contain her

anxieties and frustrations," which "makes it difficult for her to consistently and reliably deal with normative work stressors." (*Id.*)

**D.    Kenneth J. Manges, Ph.D.**

On January 26, 2016, Plaintiff was evaluated by Dr. Kenneth J. Manges, for the purpose of providing the Ohio Department of Jobs and Family Services with objective findings and observations. (R. at 331-345.) Dr. Manges noted that Plaintiff's chief complaints, according to a questionnaire she completed, were ADHD, PTSD, depression, and anxiety. (R. at 331.) Dr. Manges noted that "[h]er interview suggested that she has a depressive disorder, a social anxiety disorder and a borderline personality [sic]." (*Id.*) Plaintiff reported that she was diagnosed with Madelung's disease at birth, that her related symptoms negatively effect the use of her dominant right arm, and that she also was diagnosed with anxiety and PTSD in 2006. (R. at 332.)

Plaintiff reported to Dr. Manges that she attempts to do the laundry, but that her husband does the other chores. (*Id.*) Plaintiff also told Dr. Manges that she has difficulty sleeping, and that she has nightmares approximately three times per month about different things. (*Id.*) Plaintiff told Dr. Manges that she was taking a photography class, and that she socializes with her friends from the class twice a week. (R. at 333.) Dr. Manges reported that Plaintiff enjoyed being outdoors and she enjoyed her photography class, but that her stressors included her mental health and finances. (*Id.*)

Dr. Manges found that Plaintiff presented as having a low average intelligence.[2] (R. at 335.) Dr. Manges stated that Plaintiff reported phobias for crowds and closed spaces, and that she described her mood as "depressed and anxious" over the past six months. (R. at 336.) Dr.

---

[2] Dr. Manges found that Plaintiff's "intellectual functioning is in the Low Average range," and he reported that "[s]he graduated high school." (R. at 337.)

Manges reported that Plaintiff "agrees with others that she worries too much," and that while she feels safe at home, she feels others treat her poorly and criticize her. (R. at 337.) Dr. Manges diagnosed Plaintiff with (1) depressive disorder, and social anxiety; (2) borderline personality; (3) Madelung's disease; (4) finances [sic]; and assigned her a GAF score of 50. (*Id*.)

Dr. Manges provided a functional assessment, finding that "[b]ased upon her clinical presentation during the interview her ability to get along with the supervisors and coworkers in a work setting would be considered problematic, especially in any type of stressful situation." (R. at 338.) Dr. Manges also opined that Plaintiff's "ability to think through problems on her own and by extension in the world of work would be considered problematic and would prevent her from working," and that "[s]he demonstrated a significant impairment in her ability to appropriately respond to work pressures in an employment setting due to anxiety." (*Id.*)

Dr. Manges also completed a mental functional capacity assessment. (R. at 345.) Dr. Manges found that Plaintiff was most limited in her "ability to complete a normal workday and work week without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (*Id.*) Dr. Manges also found that Plaintiff was "moderately limited" in her "ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes," but that Plaintiff was "not significantly limited" in her "ability to interact appropriately with [the] general public" and her "ability to accept instructions and respond appropriately to criticism from supervisors." (*Id.*) Dr. Manges concluded that Plaintiff was "Unemployable." (*Id.*)

### E.     State Agency Consultants

State Agency consultant Judith Schwartzman, Psy.D., reviewed Plaintiff's file on January 18, 2016, and provided assessments of Plaintiff's physical residual functional capacity and her mental residual functional capacity ("MRFC").  (R. at 73-77)  Specifically, Dr. Schwartzman found that Plaintiff could occasionally lift and/or carry up to 50 pounds; frequently lift and/or carry up to 25 pounds; stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday; sit (with normal breaks) for about six hours in an eight-hour workday; had no postural, manipulative, visual, or communicative limitations; and had environmental limitations, as she should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation.  (R. at 73-74.)  Dr. Schwartzman also found that Plaintiff had mild restrictions in her activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation.  (R. at 72.)

Dr. Schwartzman found Plaintiff to be partially credible, noting that Plaintiff "is able to maintain all personal [activities of daily living] independently."  (R. at 73.)  Dr. Schwartzman also reviewed Drs. Sarver's opinion, giving it "great weight" and noting that it was "generally consistent" with her findings.  (*Id.*)  Dr. Schwartzman found that Plaintiff "will perform best in a non-public position," that she "is capable of brief, superficial interactions with supervisors and coworkers," and that "[s]upervisors will need to offer constructive criticism."  (R. at 76.)  Dr. Schwarzman concluded that Plaintiff was "[c]apable of work in a predictable environment with infrequent changes," and that she "will need advance notice of major changes and a gradual implementation to allow her time to adjust."  (*Id.*)  Dr. Schwarzman ultimately concluded that Plaintiff was not disabled, with the following explanation:

10

> You said you were disabled due to ADHD, depression, PTSD, anxiety, [Madelung's] disease, ear problems, tubes in your ears and restless leg syndrome. The medical records show that although you have discomfort, you are still able to stand, walk and use your arms in a satisfactory manner for some work. Your hearing is sufficient for you to perform work related tasks. Although you feel depressed, anxious and have trouble focusing at times, you are still able to understand, remember and communicate with others."

(R. at 78.)

State Agency consultant Dimitri Teague, M.D., reviewed Plaintiff's file at the reconsideration level on March 25, 2016, and agreed with all of Dr. Schwartzman's above assessments. (R. at 80-92.) Dr. Teague reviewed both Dr. Sarver's opinion and Dr. Manges' opinion, affording both opinions great weight and noting that Dr. Sarver's opinion was "generally consistent with the findings" and that Dr. Manges' opinion "is consistent with the medical evidence in file." (R. at 87.) Dr. Teague also concluded that Plaintiff was "Not Disabled," and provided following explanation:

> You said you were disabled due to [Madelung's] disease, ear problems, tubes in your ears and restless leg syndrome, ADHD, depression, PTSD, and anxiety. The medical evidence shows that you have been treated for physical conditions that cause some pain and discomfort. However, the evidence also shows that you remain capable of sitting and standing for extended periods of time, walking without assistance, and lifting objects.
>
> The medical evidence also shows that you do have some emotional conditions. However, you are still able to think and act in your own interest, communicate your needs, and understand, remember and follow simple task instructions.

(R. at 91-92.)

# IV.  ADMINISTRATIVE DECISION

On July 23, 2018, the ALJ issued his decision.  (R. at 16-33.)  At step one of the

sequential evaluation process,[3] the ALJ found that Plaintiff has not engaged in any disqualifying

substantial gainful activity since September 25, 2015.  (R. at 18-19.)  At step two, the ALJ found

that Plaintiff has the following severe combination of impairments best described as asthma,

degenerative disc disease, obesity, patellofemoral syndrome, affective disorder, and organic mild

intellectual disability.  (R. at 19.)  The ALJ found that Plaintiff did not have an impairment or

combination of impairments that meets or medically equals the severity of one of the listed

impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.*)

At step four of the sequential process, the ALJ set forth Plaintiff's residual functional

capacity ("RFC") as follows:

> After careful consideration of the entire record,  the undersigned  finds  that the
> claimant has the residual functional capacity to perform light work as defined in 20
> CFR 416.967(b). The claimant can frequently climb ramps and stairs. She can
> frequently stoop, kneel, crouch, and crawl. She can have frequent exposure to

---

[3] Social Security Regulations require ALJs to resolve a disability claim through a five-step
sequential evaluation of the evidence.  *See* 20 C.F.R. § 416.920(a)(4).  Although a dispositive
finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th
Cir. 2007), if fully considered, the sequential review considers and answers five questions:

  1. Is the claimant engaged in substantial gainful activity?

  2. Does the claimant suffer from one or more severe impairments?

  3. Do the claimant's severe impairments, alone or in combination, meet or equal the
     criteria of an impairment set forth in the Commissioner's Listing of Impairments,
     20 C.F.R. Subpart P, Appendix 1?

  4. Considering the claimant's residual functional capacity, can the claimant
     perform his or her past relevant work?

  5. Considering the claimant's age, education, past work experience, and residual
     functional capacity, can the claimant perform other work available in the national
     economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster
v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

extreme temperatures, humidity, atmospheric conditions, and pulmonary irritants. She can only occasionally climb ladders, ropes, or scaffolds. She can occasionally be exposed to hazards such as dangerous machinery and unprotected heights. The claimant can perform simple, routine, and repetitive tasks, where written instructions are simple and the tasks can be taught by demonstration. She cannot perform fast production pace work. The claimant can have only occasional interaction with others and cannot do work requiring conflict resolution or persuading others. Finally, the claimant can handle occasional changes in the work setting that are explained.

(R. at 22-23.) The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. at 24.) Specifically, the ALJ highlighted Plaintiff's testimony at the administrative hearing, regarding her photography class, working towards her GED, living with and caring for her two-month-old daughter, and applying for a number of jobs, and noted that "the nature of these reported activities are internally inconsistent, and inconsistent with the allegations of severe pain and disabling symptoms made in connection with this application." (R. at 23.)

The ALJ also reviewed and considered several medical opinions. First, the ALJ considered the January 2016 opinion of psychologist Dr. Gary S. Sarver, affording the opinion "some weight." (R. at 25.) The ALJ concluded that Dr. Sarver's opinion "is generally consistent with his own examination" but "he was not able to examine additional evidence obtained at the hearing level or listen to the claimant's testimony." Further, the ALJ found that Dr. Sarver's opinion "is not entirely consistent with the medical evidence of record, showing little treatment outside of medication management and mental status examination almost entirely within normal limits." (*Id.*) Next, the ALJ considered the opinion of Dr. Kenneth Manges, also from January 2016. (R. at 26.) The ALJ gave the opinion "some weight" because "his opinion

is also generally consistent with his examination findings, [but] he was not able to examine additional evidence obtained at the hearing level or listen to the claimant's testimony."  (R. at 26.)  To that end, the ALJ found that Dr. Manges' "opinion concerning that the claimant would have a marked limitation in completing a normal workday and working at a consistent pace without unreasonable rest periods is inconsistent with the claimant's reported activities of daily living and the medical evidence of record showing generally unremarkable mental status examinations and minimal treatment."  (*Id.*)

The ALJ also considered opinions from State Agency medical consultants and psychological consultants.  (R. at 26-27.)  The ALJ gave the State Agency medical consultants' opinion "some weight" because they "did not have opportunity to examine the claimant or review the additional medical evidence received at the hearing level," and such evidence "showing additional treatment and reduced range of motion, tenderness, and pain with straight leg raises convinced the undersigned that the claimant is more limited by her physical impairments than the State Agency consultants opined."  (R. at 26.)  As for the psychological consultants, the ALJ noted that they "indicated the claimant's mental impairments caused mild limitation in activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties maintaining concentration, persistence, or pace," but only afforded the psychological consultants' opinions "some weight," finding that "their opinion was somewhat consistent with the medical evidence of record" because they "did not examine the claimant or review additional evidence obtained at the hearing level."  (R. at 27.)

Relying on testimony from the VE, the ALJ found that considering Plaintiff's age, education, work experience, and RFC, she can perform jobs that exist in significant numbers in

the national economy, including mail sorter, garment folder, and machine feeder.  (R. at 28.)  He

therefore concluded that Plaintiff was not disabled under the Social Security Act.  (*Id.*)

## V.  STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the

Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to

proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009)

(quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. §

405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by

substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is

defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486

F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must

"'take into account whatever in the record fairly detracts from [the] weight'" of the

Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial

evidence supports the ALJ's decision, this Court defers to that finding 'even if there is

substantial evidence in the record that would have supported an opposite conclusion.'"  *Blakley

v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d

270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision

of the Commissioner will not be upheld where the [Social Security Administration] fails to

follow its own regulations and where that error prejudices a claimant on the merits or deprives

the claimant of a substantial right.'"  *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

# VI.  ANALYSIS

Plaintiff puts forth one assignment of error:  that the ALJ's treatment of the State Agency psychological opinions is not substantially supported.  (ECF No. 11 at PAGEID ## 572-581.) Plaintiff argues that "[s]everal of the [] limitations included in the opinions of both Dr. Schwartzman and Dr. Goldsmith are generally understood to be work preclusive, and in any event are significantly more limited than the ALJ's own determined MRFC."  (*Id.* at PAGEID # 575.)  Specifically, Plaintiff argued that "it was paramount that the ALJ adequately explain his reasons" for omitting certain of the consultants' limitations.  (*Id.*)  Plaintiff argues that "the ALJ asserted that new medical evidence supported a deviation from the State agency opinions which were more restrictive than his own determined MRFC, but failed to explain which evidence supported the deviation," and that "[i]n fact, the [new] evidence actually tends to support the State agency opinions."  (*Id.* at PAGEID ## 577-578.)  Plaintiff concludes by arguing that "the ALJ failed to provide supportable reasons for failing to adopt all of the limitations opined by both State agency psychological experts, and failed to include these factors into the determined MRFC, his reliance at Step Five on the testimony offered by the vocational expert was misplaced and his decision cannot be supported by substantial evidence."  (*Id.* at PAGEID # 580.)[4]

---

[4] Plaintiff also argues in passing that "the ALJ seems to assert that a recent change in Paragraph B criteria should impact not only the weight afforded to State agency assessments of Paragraph B ratings, but also the weight afforded to their Mental Residual Functional Capacity Assessments," but [t]his is simply not true."  (*Id.* at PAGEID # 578.)  The Parties did not brief this argument, however, and the Court finds that the ALJ's isolated comment that "the Paragraph B criteria for mental impairments have been altered by regulation since [the State Agency consultant's] opinion was offered" was immaterial to the ALJ's decision.  (*See* R. at 27.) Assuming, *arguendo*, that the ALJ's statement was factually incorrect (as Plaintiff avers), the

16

In response, the Commissioner argues that "Plaintiff's contentions are not borne out by the record and should be rejected." (ECF No. 17 at PAGEID # 594.) Specifically, the Commissioner contends that none of the individuals who provided the four medical opinions (Dr. Sarver, Dr. Manges, or the two State Agency consultants) had access to critical evidence that contradicted the medical opinions in the file:

> Neither the consultative examining psychologists nor the reviewing psychologists had access to Plaintiff's mental health counseling notes which showed significant improvements in her symptoms and essentially normal mental status findings and her reports to medical sources that conflicted with the findings of both consultative examiners, nor were any of these medical sources privy to her administrative hearing testimony where she testified to activities of daily living that contradicted Plaintiff's reports to the consultative examiners, and contradicted the findings/opinions of the above-referenced four medical sources.

(*Id.* at PAGEID # 595.) The Commissioner argues that in light of this previously-unconsidered evidence, "the ALJ reasonably assessed Plaintiff as having the mental abilities to perform simple, routine, and repetitive tasks (where written instructions are simple and the tasks can be taught by demonstration); work where only occasional changes occur in the work setting (that are explained); no work requiring a fast production pace, conflict resolution or work persuading others; and only occasional interaction with others." (*Id.* at PAGEID # 605.) Accordingly, the Commissioner concludes "the ALJ's mental RFC finding more than adequately accommodated for any mental limitations Plaintiff had." (*Id.*)

In reply, Plaintiff characterizes the Commissioner's position as "post-hoc rationalization for the ALJ's conclusions." (ECF No. 20 at PAGEID # 611.) Plaintiff stresses that she was unrepresented by counsel at the administrative hearing and argues that the Commissioner either cherry picks her hearing testimony out of context or deliberately overlooks other testimony

---

ALJ's mistake was harmless error. This Court will restrict its analysis to Plaintiff's primary argument, which has been fully briefed.

which supports Plaintiff's position. (*Id.* at PAGEID ## 611-613.) Plaintiff argues that, at the very least, the ALJ "failed to develop testimony from [Plaintiff] that would likely have supported the expert opinions," and therefore "a remand is necessary for the taking of additional testimony and the proper evaluation of all of the evidence of record." (*Id.* at PAGEID # 614.)

As a preliminary matter, the determination of a claimant's RFC is an issue reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d), 416.927(d). Nevertheless, substantial evidence must support the Commissioner's RFC finding. *Berry v. Astrue*, No. 1:08-cv-411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010). An ALJ must explain how the evidence supports the limitations that he or she sets forth in the claimant's RFC:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

S.S.R. 96-8p, 1996 WL 374184, at *7 (internal footnote omitted).

In addition, the ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case. 20 C.F.R. § 416.927(c) ("Regardless of its source, we will evaluate every medical opinion we receive."). The applicable regulations define medical opinions as "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(1); *see also* SSR 96–8p, 1996 WL 374184, *7 (July 2, 1996) ("The RFC assessment must always consider and address medical source opinions."). Like other medical source opinions, the ALJ

18

must consider state agency medical opinions.  *See* 20 C.F.R. § 416.913a(b)(1) ("Administrative

law judges are not required to adopt any prior administrative medical findings, but they must

consider this evidence according to §§ 416.920b, 416.920c, and 416.927, as appropriate, because

our Federal or State agency medical or psychological consultants are highly qualified and experts

in Social Security disability evaluation."); SSR 96-6p, 1996 WL 374180, *2 (July 2, 1996)

(administrative law judges are required to consider state agency medical "findings of fact about

the nature and severity of an individual's impairment(s) as opinions of nonexamining physicians

and psychologists. Administrative law judges and Appeals Council are not bound by findings

made by State agency . . . but they may not ignore these opinions and must explain the weight

given to the opinions in their decisions.").

Regardless of the source of a medical opinion, in weighing the opinion, the ALJ must

apply the factors set forth in 20 C.F.R. § 416.927(c), including the examining and treatment

relationship, supportability of the opinion, consistency of the opinion with the record as a whole,

and the specialization of the source.  "In appropriate circumstances, opinions from State agency

medical and psychological consultants and other program physicians and psychologists may be

entitled to greater weight than the opinions of treating or examining sources."  SSR 96-6p, 1996

WL 374180, *3; *see also Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 834 (6th Cir. 2016) (state-

agency medical consultants are "highly qualified physicians and psychologists who are experts in

the evaluation of the medical issues in disability claims under the [Social Security] Act"; thus, in

some cases, "an ALJ may assign greater weight to a state agency consultant's opinion than to

that of a treating or examining source.") (first alteration in original) (internal quotation marks

omitted); *Hoskins v. Comm'r of Soc. Sec.*, 106 F. App'x 412, 415 (6th Cir. 2004) ("State agency

medical consultants are considered experts and their opinions may be entitled to greater weight if their opinions are supported by the evidence.").

Here, as the Commissioner correctly observes, none of Plaintiff's treatment providers issued a medical opinion regarding Plaintiff's condition.  (ECF No. 17 at PAGEID # 595.) Accordingly, there are only four relevant medical opinions in the record:  the January 8, 2016 Consultative Psychological Evaluation by Dr. Gary Sarver; the January 26, 2016 Consultative Psychological Evaluation by Dr. Kenneth Manges; and the two opinions of the State Agency reviewing psychologists, Drs. Schwartzman and Goldsmith.  (R. at 67-78, 80-92, 322-345.) Because none of these opinions came from a treating physician, the ALJ had "substantial latitude in weighing the other medical evidence and resolving conflicts in that evidence."  *Smith v. Comm'r of Soc. Sec.*, No. 2:13-CV-582, 2014 WL 1764663, at *7 (S.D. Ohio May 1, 2014), *report and recommendation adopted sub nom. Smith v. Colvin*, No. 2:13-CV-582, 2014 WL 2197940 (S.D. Ohio May 27, 2014) ("When there is no treating physician opinion in the record, the ALJ is generally given substantial latitude in weighing the other medical evidence and resolving conflicts in that evidence.").

Drs. Schwartzman and Goldsmith are State Agency consultants.  An ALJ "must explain in the decision the weight given the opinions of a State Agency medical ' . . . consultant[,]" 20 C.F.R. § 404.2527(e)(2)(ii), but need not give "an exhaustive factor-by-factor analysis" of their decision.  *Cf. Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011) (citations omitted).  Although "an opinion from a medical source who has examined a claimant is [generally] given more weight than that from a source who has not performed an examination," ALJs have more discretion in considering non-treating source opinions.  *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 375 (6th Cir. 2013).  ALJs are not required to give "good reasons" for

20

discounting non-treating source opinions.  *See Martin v. Comm'r of Soc. Sec.*, 658 F. App'x 255, 259 (6th Cir. 2016).

Plaintiff's primary argument is that "the ALJ asserted that new medical evidence supported a deviation from the State agency opinions which were more restrictive than his own determined MRFC, but failed to explain which evidence supported the deviation."  (ECF No. 11 at PAGEID ## 577-578.)  Plaintiff argues that the State Agency consultants' opinions were "significantly more limited than the ALJ's own determined MRFC," and noted that "[n]one of the ALJ's hypothetical questions to the [VE] included [] particular limitations or other limitations opined by both State agency experts."  (*Id.* at R. 578.)

However, "there is no regulatory requirement that an ALJ adopt every facet of a particular medical opinion in formulating an RFC, so long as the record as a whole supports the RFC actually determined by the ALJ, and she adequately explains her analysis in a manner sufficient to allow review."  *Kincaid v. Comm'r of Soc. Sec.*, No. 1:16-CV-736, 2017 WL 9515966, at *3 (S.D. Ohio June 12, 2017), *report and recommendation adopted*, No. 1:16CV736, 2017 WL 4334194 (S.D. Ohio Sept. 30, 2017).  A disagreement with how the ALJ decided to weigh differing medical opinions "is clearly not a basis for . . . setting aside the ALJ's factual findings."  *Id.* (citing *Mullins v. Sec'y of Health & Hum. Servs.*, 836 F.2d 980, 984 (6th Cir. 1987)).  Further, "there is no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale."  *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015) (citations omitted).  As for the hypothetical questions the ALJ posed to the VE, it is well settled that the ALJ "is required to incorporate only those limitations accepted as credible by the finder of fact."  *Johnson v. Comm'r of Soc. Sec.*, No. 2:18-CV-00245, 2019 WL 2428473, at *10 (S.D. Ohio June

21

11, 2019), *report and recommendation adopted*, No. 2:18-CV-245, 2019 WL 3944445 (S.D. Ohio Aug. 21, 2019) (internal citations omitted); *see also Gibbens v. Comm'r of Soc. Sec.*, 659 F. App'x 238, 250 (6th Cir. 2016) (finding that the ALJ's hypothetical questions to the vocational expert "fairly portrayed" the claimant's limitations as supported by the objective evidence and that "the ALJ was under no obligation to include" limitations that he found not credible in such hypotheticals); *Spicer v. Comm'r of Soc. Sec.*, 651 F. App'x 491, 494 (6th Cir. 2016) (rejecting contention that the ALJ erred by relying on VE testimony given in response to a hypothetical that did not incorporate all of claimant's limitations "because the ALJ's hypothetical question incorporated all of the functional limitations that he found to be credible").

To that end, the Undersigned finds that the ALJ adequately explained her analysis in a manner sufficient to allow review, and that substantial evidence supports the ALJ's RFC finding. Most critically, Plaintiff is incorrect to suggest that "the ALJ utterly fail[ed] to identify which new evidence might be inconsistent with the State agency opinions." (ECF No. 11 at PAGEID # 576.) As the Commissioner correctly points out, "[n]either the consultative examining psychologists nor the reviewing [State Agency] psychologists had access to Plaintiff's mental health counseling notes." (ECF No. 17 at PAGEID # 595; *see also* R. at 67-78, 80-92, 322-345.) Moreover, the ALJ extensively discussed the relevant evidence from Plaintiff's counseling records, which the State Agency consultants did not consider:

> Turning to the claimant's mental impairments, the claimant began receiving treatment from Hopewell Health Centers in February of 2015. At her diagnostic assessment, the claimant reported nightmares, depressive symptoms, and PTSD symptoms. The claimant had previously been prescribed psychotropic medication and Hopewell took over her medication management. The claimant continued to received services from Hopewell, approximately once a month, until April of 2017. **The claimant's records show that she was responsive to medication and her symptoms of depression improved. She did not complain of side effects. In January of 2016, the claimant reported that her mood overall was stable and she was managing well.** The claimant discontinued her medication in April of

22

2017 due to her pregnancy. **Mental status examinations throughout the relevant period were generally within normal limits.** However, at times the claimant did display a dysphoric or depressed mood.

(R. at 25 (internal citations omitted; emphasis added).)  The ALJ also extensively discussed the relevant hearing testimony, which the State Agency consultants also could not have considered:

At her hearing, she reported that while she does have a driver's license, she does not like to drive long distances. **She testified that she attends photography class twice a week and is working towards her GED. At the time of the hearing, the claimant had a two-year-old daughter who she testified caring for with the help of her boyfriend and mother.** The claimant testified that she lives with her daughter in a trailer near her mother's home. **The claimant testified that she has applied for a number of jobs**, but has not been hired.

(R. at 23 (emphasis added).)  Then, contrary to Plaintiff's assertions, the ALJ explained how this new evidence was inconsistent with Plaintiff's complaints:

**The undersigned finds that the nature of these reported activities are internally inconsistent, and inconsistent with the allegations of severe pain and disabling symptoms made in connection with this application**.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, **the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision**.

(R. at 23-24 (emphasis added).)  Finally, the ALJ set forth exactly how this new evidence undercut Drs. Sarver and Manges' opinions (which, as Plaintiff concedes, collectively served as a strong basis for the State Agency consultants' opinions):

As with Dr. Sarver, Dr. Manges is an expert who was able to examine the claimant, his opinion is also generally consistent with his examination findings, and he was not able to examine additional evidence obtained at the hearing level or listen to the claimant's testimony. **Furthermore, his opinion concerning that the claimant would have a marked limitation in completing a normal workday and working at a consistent pace without unreasonable rest periods is inconsistent with the claimant's reported activities of daily living and the medical evidence of record showing generally unremarkable mental status examinations and minimal treatment.** Therefore, the undersigned also gives this opinion only some weight.

23

(R. at 26 (emphasis added).)

Plaintiff contends that the evidence not considered by the State Agency consultants "actually tends to support" the consultants' opinion. (ECF No. 11 at PAGEID ## 575-578.) The Court does not need to address this argument, however, because the critical question before the Court is whether substantial evidence supports the Commissioner's RFC finding, not whether substantial evidence supports Plaintiff's position. *Berry*, 2010 WL 3730983, at *8. The issues are not mutually exclusive – there can be substantial evidence that may support Plaintiff's position and substantial evidence that supports the ALJ's finding – but the critical issue at this stage is only whether the ALJ's finding is supported by substantial evidence. *Nash v. Comm'r of Soc. Sec.*, No. 19-6321, 2020 WL 6882255, at *4 (6th Cir. Aug. 10, 2020) ("We review an ALJ's RFC determination for substantial evidence and the application of correct legal standards. If the determination is supported by substantial evidence, we defer to that determination even in the face of substantial evidence supporting the opposite conclusion.") (Citing *Blakley*, 581 F.3d at 405).

Here, the Court finds that the ALJ's RFC is supported by substantial evidence. After considering the entire record, including not only the two State Agency consultants' opinions but also the opinions of Drs. Sarver and Mange, the ALJ cited substantial evidence in concluding that Plaintiff is capable of light work without highly restrictive social or stress-related limitations. (R. at 22-27.) Most significantly, as discussed, the ALJ cited (1) Plaintiff's hearing testimony, which was inconsistent with allegations of severe pain and disabling symptoms and reflected the depth of Plaintiff's ability to perform activities of daily living and to interact with others under the right circumstances, and (2) Plaintiff's counseling records, which "show that she was responsive to medication and her symptoms of depression improved" and contain mental

status examinations that "were generally within normal limits." (*Id.*)  To the extent Plaintiff challenges any differences between the medical opinions in the record and the ALJ's RFC, these critical pieces of substantial evidence support the ALJ's RFC.  The Court must therefore defer to the ALJ's RFC.  *Nash*, 2020 WL 6882255, at *4.

To be clear, an ALJ is not required to mirror or parrot medical opinions verbatim, especially when provided with additional evidence.  *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009).  And where, as here, an ALJ has accorded an opinion only "some weight," the ALJ need not include all of the limitations in the RFC or even discuss why certain limitations have been omitted.  While Plaintiff may have preferred a different RFC than the one determined by the ALJ, the ALJ thoroughly explained the bases for the RFC determination as it relates to Drs. Schwartzman and Goldsmith's proposed limitations, and this explanation enjoys substantial support in the record.  *Dickinson v. Comm'r of Soc. Sec.*, No. 2:19-CV-3670, 2020 WL 4333296, at *11 (S.D. Ohio July 28, 2020), *report and recommendation adopted*, No. 2:19-CV-3670, 2020 WL 5016823 (S.D. Ohio Aug. 25, 2020) (citing *Schmiedebusch v. Comm'r of Soc. Sec.*, 536 F. App'x 637, 649 (6th Cir. 2013); *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) ("The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.")).  Under these circumstances, the Undersigned finds to Plaintiff's statement of error without merit.

For these reasons, it is **RECOMMENDED** that Plaintiff's contention of error be **OVERRULED**, and the Commissioner's decision be **AFFIRMED**.

## VII.  CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits.  Based on the foregoing, it is therefore **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**.

## PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816*,* 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation).  Even when timely objections are filed, appellate review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

**Date: December 21, 2020**                    */s/ Elizabeth A. Preston Deavers*
                                               **ELIZABETH A. PRESTON DEAVERS**
                                               **CHIEF UNITED STATES MAGISTRATE JUDGE**

27